Filed 12/5/23  P. v. Alvarez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>REGGIE JOSHUA ALVAREZ,<br><br>Defendant and Appellant. | D082998<br><br><br>(Super. Ct. No. FSB20000741) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Jerry E. Johnson, Judge.  Affirmed.

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Reggie Joshua Alvarez appeals his conviction for rape (Pen. Code, § 261, subd. (a)(2)), asserting the trial court erred by admitting the victim's incriminating hearsay statements to law enforcement in violation of his right to confrontation under the Sixth Amendment. Because we conclude the admission of these statements, though improper, was harmless beyond a reasonable doubt, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On an early morning in February 2020, Jane Doe was standing alone on the sidewalk of a major San Bernadino street, behaving oddly. A surveillance camera captured the events that followed. Over the course of an hour, she can be seen (on dark, grainy security footage[1]) pacing, picking up items from the sidewalk, walking out into the street, waving at passing cars, and interacting with passers-by. At 2:15 a.m., she appears to fall backward to the ground without any cause. Within a minute, Alvarez walks up to Jane Doe. After the two interact for several minutes, Jane Doe walks away. They come together again before disappearing out of view toward the sidewalk planters at 2:21 a.m.

At this time, Deputy Angelini of the San Bernardino County Sheriff's Department was patrolling the street in a marked patrol vehicle. Angelini stopped to briefly speak to a man with a bicycle at around 2:22 a.m. Once their conversation ended, the man told Angelini he "should head down the street," as "he pointed" down the street toward Jane Doe and Alvarez, "and said that he heard a female screaming for help." Angelini headed in that

---

[1]    We have reviewed the footage from the surveillance camera and the body-worn cameras of the responding officers.

direction.  As he drove slowly with his windows rolled down, he heard a woman "screaming for help."  Angelini then saw Jane Doe "was bent over at the waist with her pants and her underwear down at her ankles" and "Alvarez behind her having sexual intercourse with her."

As Deputy Angelini exited his patrol vehicle, Jane Doe yelled to him, "Help me.  Help me.  He's raping me."  According to Angelini, as she made that statement, Alvarez "backed away from her, removed his penis from her vagina," "pulled up his pants and started to walk . . . [a]way from [Angelini]."  When Alvarez did not respond to Angelini's question of what he was doing, Angelini handcuffed him.  Angelini observed lacerations to both of Jane Doe's shoulders, and a laceration to Alvarez's head.

In response to Deputy Angelini's call, multiple officers from the San Bernardino Police Department responded to the scene, along with an ambulance.  According to one responding officer, Jane Doe was "distraught" and "crying."  In the next 20 minutes or so, officers spoke separately with Jane Doe and Alvarez.  The conversations were recorded by the officers' body-worn camera.

Jane Doe was unavailable at trial.  Videos of two conversations between Jane Doe and the officers at the scene were admitted at trial.  In them, she appeared distressed, crying and saying her arms hurt multiple times.  In the first conversation, Jane Doe told officers the following in response to their questions:[2]

"[Officer 1]:     We're gonna go check him out so what happened?

---

[2]     The excerpts in this opinion are based on transcripts of the recordings that were provided to the jury.  Although these transcripts are not themselves evidence, both parties rely on them for purposes of appeal, and neither object to their accuracy.

3

"[Jane Doe]: He said give me something give me something. I don't want to right now, I don't want to. And then he just threw me down on the floor right there (points) and started taking off my pants.

"[Officer 1]: Where did you, did you meet him right here?

"[Jane Doe]: Yeah I was hanging out in front of the Thrift Store.

"[Officer 1]: Where?

"[Jane Doe]: The Thrift Store

"[Officer 1]: Okay.

"[Jane Doe]: Yeah I just met him there up front.

"[Officer 1]: Okay how'd you guys end up over there?

"[Jane Doe]: I took off so I could buy a pack of cigarettes and I went home passed right through here and he was still here so we just start talking and then it happened and . . .

"[Officer 1]: *Well I need you to go into detail. It's very important that you go into detail and tell me what happened.*

"[Jane Doe]: We just had, I didn't wanna have sex now with anybody right now. I didn't even know him and he kept throwing himself at me, throw himself at me trying to ah, he said umm, I couldn't remember what he said but like I just said why you trying, why-why you trying to do that cuz we were talking about relationships and stuff. I guess his girlfriend is-was girlfriend is like umm a fuck girlfriend I don't know. And then he put me down he just humping me naked over here. Put his hands on my neck and pulled my hair. Owww.

"[Officer 1]: How long, how long, how long was he having sex with you?

4

"[Jane Doe]:     For like probably I don't know like less, five like I don't know five minutes eight minutes or something.

"[Officer 1]:     Five minutes okay, did he ejaculate?

"[Jane Doe]:     I don't know because he said he was going to but then if I remember if I felt it or nothing.

"[Officer 1]:     Alright do you feel any semen inside of you?

"[Jane Doe]:     No.  Oh God.

"[Officer 1]:     Do you want to go to the hospital today?

"[Jane Doe]:     Umm it's late I can take myself in the morning by seven in the morning [inaudible]

"[Officer 2]:     You don't, you don't wanna go right now?

"[Jane Doe]:     I [inaudible] I'm just here for

"[Officer 2]:     Okay if you [inaudible]

"[Jane Doe]:     I'm playing with I'm playing with her and umm . . .

"[Officer 1]:     Playing with who?

"[Jane Doe]:     Playing with her play fighting just play fighting

"[Officer 2]:     Who's-who's her?

"[Jane Doe]:     I don't know like I said we just lyed [*sic*] here, lyed [*sic*] here. I-I-I [inaudible] I just walked.  She climbed in there and beat the hell outta me and . . .

"[Officer 2]:     A lady climbed in the fire hydrant?

"[Jane Doe]:     [Inaudible] and she [inaudible] I didn't try to [inaudible]

"[Officer 2]:     So do you wanna go to the hospital or no?

5

"[Jane Doe]:    No.

"[Officer 2]:    No?

"[Jane Doe]:    I'm okay.

"[Officer 1]:    [Inaudible] handle this?

"[Jane Doe]:    I just need Band Aids.

"[Officer 1]:    Okay we'll get you some Band Aids okay?  One second okay?"  (Italics added.)

In the second conversation, Jane Doe said the following in response to an officer's questions:

"[Officer]:    So, who is this person to you?

"[Jane Doe]:    Nobody.  I never seen him before in my life.

"[Officer]:    *And so, what happened over here?*

"[Jane Doe]:    I don't know.  I was waiting to (unintelligible) . . . right here.  So, he was coming on to me, (unintelligible) asking for a cigarette.  Then, like (unintelligible) . . .  later, he stood up and he started demanding . . . (unintelligible) . . .

"[Officer]:    I'm sorry, what?

"[Jane Doe]:    Demanding I do that (unintelligible) . . . to have sex.  And I said NO.  No . . . he said do you want to go someplace, he said he wanted to smoke, and then . . . that happened.

"[Officer]:    *What happened?*

"[Jane Doe]:    He just started taking off my clothes.  I said, no, no! And . . . I was defiled.

"[Officer]:    Are you okay?

"[Jane Doe]:    Yeah, I'm okay.  A little shaken up and cold." (Italics added.)

6

A video of the officers' conversations with Alvarez at the scene was also admitted at trial. In it, Alvarez said he did not have sex with Jane Doe. He claimed he "never touched her" and only approached her because she was screaming and he had tried to calm her down. He said he was just walking past on his way to his "cousin's house down the street" when he had seen "a white guy with a basket."

Later that night, at the police station, Alvarez continued to deny having sex with or raping Jane Doe. He changed his version of events slightly, now claiming he had met Jane Doe at a bar and played pool with her and that he was on his way to a "friend's house." Alvarez explained the "white guy with a basket" had assaulted Jane Doe. A recording of his police station statement was admitted at trial:

"[Alvarez]:  . . . And what's it called, umm, this female was standing there on the side of the road screaming like ass-my dead ass I'm talking [inaudible] if you hear somebody dead ass screaming and they're screaming like, like they were dying, that's how she was screaming, like she was dying. Okay so I walked up and some white fool . . . . I walked up I seen some white guy with a basket, he was running off okay? So when I walked up I told her, I was like hey what's wrong? As soon as I said that as soon as I said that, that's when all this officer showed up. I put my hand on her shoulder, that's all I did, honestly. Look, I never touched her in no type a-way. I only put my hand on her shoulder and that[']s when the officer tried to say that I had my pants down."

"[Alvarez]:  And I seen her I seen him, he was grabbing her by her hair and everything. That's when I stepped up, that's what I told to them hey darling hey look can you relax you need to go somewhere [inaudible] and that's when the other officer pulled up when the white guy took off with his basket,

7

then that's when the officer told me that I'm trying to touch this female. That's when like, I told him straight up it wasn't me, I don't even know this girl. Then that's when he hit me, putting handcuffs and everything and he was [inaudible] cooperative being uncooperative and everything with him."

Jane Doe and Alvarez were taken to separate hospitals for medical treatment and sexual assault examinations. According to the nurse who examined Jane Doe, there were fresh abrasions on both of her elbows and knees. The nurse noted Jane Doe appeared "[u]nder the influence, agitated, and sleepy." Jane Doe told the nurse she had used drugs within the last 120 hours.

A criminalist tested evidence collected from both Jane Doe and Alvarez for DNA. Female DNA in samples swabbed from Alvarez's penis and scrotum was "at least 49 quintillion times more likely" to belong to Jane Doe than some other person. A swab of Jane Doe's cervix contained male DNA, but the amount obtained was insufficient to analyze.

Alvarez did not present any evidence in his case in chief. The jury deliberated for less than two hours before returning a guilty verdict. Alvarez was sentenced to three years in state prison.

DISCUSSION

Alvarez asserts Jane Doe's recorded statements to the officers at the scene were inadmissible hearsay and their admission at trial, without his ability to cross-examine Jane Doe, violated his right of confrontation under the Sixth Amendment. We agree there was a Sixth Amendment violation but because we find the error harmless beyond a reasonable doubt, we affirm.

"In light of our hearsay rules and [*Crawford v. Washington* (2004) 541 U.S 36) (*Crawford*)], a court addressing the admissibility of out-of-court

8

statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680.)

In *Crawford*, the United States Supreme Court held that admission of "testimonial" hearsay violates the Confrontation Clause of the Sixth Amendment unless the declarant can be cross-examined at trial or the declarant is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. The Court later explained the difference between "testimonial" and "nontestimonial" statements to government officials:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

(*Davis v. Washington* (2006) 547 U.S. 813, 822.)

On appeal, we independently review whether admission of evidence gave rise to a violation of the Sixth Amendment right of confrontation. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477–1478.) We evaluate the primary purpose for which a statement was taken under an objective standard, "considering all the circumstances that might reasonably bear on

9

the intent of the participants in the conversation." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*).)

The People contend Jane Doe's hearsay statements to law enforcement at the scene were properly admitted under the "spontaneous statements," or excited utterance, exception. Under Evidence Code section 1240, a hearsay statement is admissible if it: "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." We shall assume without deciding the statements were admissible under the exception. We conclude, however, the admission of the statements violated Alvarez's right to confrontation because the statements were testimonial hearsay.

The People assert Jane Doe's statements were not testimonial because they "were made while police were responding to an ongoing emergency, and the primary purpose of the police questioning was to assess the situation and collect information regarding [Jane Doe's] medical condition." The record does not support these contentions.

Deputy Angelini arrived on the scene at approximately 2:29 a.m. and almost immediately apprehended and handcuffed Alvarez. By 2:39 a.m., three more police vehicles had responded to the scene, and by the time officers questioned Jane Doe, paramedics had arrived as well. The suspect had been apprehended, the scene was well secured, and both Jane Doe and Alvarez had only minor injuries. There was no "ongoing emergency" at that point.

The nature of the officers' questioning reflects an intent to investigate a completed crime and develop evidence. Jane Doe was asked "what happened" and told to "go into detail." The officers sought a timeline of the assault and

10

information about the relationship between Alvarez and Jane Doe.  Jane Doe's responses to those questions were relevant for investigative purposes only.  To the extent some of the officer's questions could conceivably assist in assessing Jane Doe's medical condition, it was plainly not the primary purpose.  There was already a paramedic present who was responsible for Jane Doe's medical care.  (See *Cage, supra*, 40 Cal.4th at pp. 984–985 [testimonial nature of statements was "manifest" when "emergency medical personnel were already attending to" the victim at a hospital and an officer asked him to "describe 'what [had] happened *between [the victim] and the defendant*' "].)

Thus Jane Doe's hearsay statements were testimonial.  Because Alvarez had no opportunity to cross-examine Jane Doe, their admission violated the Confrontation Clause.

We next examine for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684 (*Van Arsdall*) [Confrontation Clause violations are subject to federal harmless-error analysis].)  The harmless error inquiry asks:  " ' "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" ' "  (*In re Lopez* (2023) 14 Cal.5th 562, 581.)  And "[w]hether [a *Crawford*] error is harmless in a particular case depends upon a host of factors . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  (*Van Arsdall,* at p. 684.)

We conclude the error here was harmless under the *Chapman* standard.[3] As an initial matter, there was strong evidence that Alvarez had sexual intercourse with Jane Doe. Deputy Angelini witnessed Alvarez in the commission of the act, and there was unrebutted evidence that Jane Doe's DNA was present on Alvarez's genitals. Although Alvarez denied touching Jane Doe to police, on appeal, he does not dispute that intercourse occurred.

There was also overwhelming circumstantial and direct evidence, independent of Jane Doe's recorded statements, that the sex was not consensual. The man on the bicycle directed Deputy Angelini to the area where Alvarez and Jane Doe were later found to be engaged in sexual intercourse because "he heard a female screaming for help." When Deputy Angelini drove toward the area, he also heard Jane Doe "screaming for help." And when Angelini got out of his patrol vehicle, Jane Doe spontaneously yelled, "Help me. Help me. He's raping me."[4] Jane Doe had also suffered fresh scrapes on her elbows and knees. All this evidence supports a

---

[3] Assuming Jane Doe's statements were also inadmissible hearsay, our analysis would be governed by *People v. Watson* (1956) 46 Cal.2d 818, 836, under which we reverse only if it is reasonably probable that Alvarez would have reached a more favorable result in the absence of the error. (See *People v. Clark* (2021) 62 Cal.App.5th 939, 968 [state law evidentiary error governed by *Watson*].) Having concluded that the error was harmless under the more-rigorous *Chapman* standard, we would also conclude that the error was harmless for purposes of *Watson*. Accordingly, we need not separately address the parties' hearsay arguments.

[4] Alvarez contends this statement is not credible because Alvarez could not have been actively penetrating Jane Doe when she yelled this. This is a meritless argument. Given that Angelini testified that he observed them having sex seconds earlier, the active tense is colloquially, if not literally, accurate.

conclusion beyond a reasonable doubt that Alvarez engaged in non-consensual intercourse with Jane Doe.

Further still, in his interviews with police, Alvarez did not claim he had consensual sex with Jane Doe. Rather, he claimed she was assaulted by a white man with a basket and his contact with her was limited to briefly consoling her after that assault. There was evidence, however, to refute his claim beyond a reasonable doubt. The surveillance footage shows Jane Doe and Alvarez were together for over five minutes before Jane Doe was assaulted, and there was no person that appeared with a basket. As the jury was instructed, Alvarez's denial he had sexual intercourse with Jane Doe supports the reasonable inference that Alvarez was conscious of his guilt. (See CALCRIM No. 362 [defendant's "false or misleading statement . . . may show" awareness of guilt].)

On appeal, Alvarez focuses much of his argument on Jane Doe's asserted lack of credibility. He identifies two reasons she lacked credibility. First, he claims Jane Doe was unable "to perceive and recall the events of that evening" given her intoxication. But the jury received evidence suggesting Jane Doe may have lacked capacity to perceive and recall the events. The jury was presented with the surveillance footage that showed Jane Doe's odd behavior. The nurse who examined Jane Doe testified she appeared "under the influence." Even the improperly admitted footage tended to show that Jane Doe was not wholly lucid, most strikingly in her illogical statement about "play fighting" with a woman who climbed into a fire hydrant. Despite having evidence of Jane Doe's incoherence at the time she made the challenged statements, the jury's swift verdict suggests it did not have trouble with Jane Doe's credibility because she presented signs of intoxication.

13

Second, Alvarez contends that because Jane Doe's "behavior of waving at cars and at whatever men walked by is consistent with her being on the street that night for the purpose of soliciting prostitution," he was denied the opportunity to cross-examine her on "whether she agreed to sex as part of a business transaction." This argument does not help Alvarez because Alvarez denied in his police statements he had *any* sexual intercourse with Jane Doe.

In sum, we conclude the evidence of Alvarez's guilt on rape was overwhelming and the improperly admitted evidence was cumulative of other properly admitted evidence. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 652–653 [admission of statements bearing directly on intent was harmless beyond a reasonable doubt in light of "overwhelming circumstantial evidence" of defendant's intent]; *Cage, supra,* 40 Cal.4th at p. 993 [admission of "largely cumulative" statements harmless beyond a reasonable doubt where they "were substantially consistent with" other admissible statements, "and nothing in the additional details [the inadmissible statements] contained was crucial to the charges"].) And here, the jury's very brief deliberations give no indication this was a close case in which the introduction of cumulative evidence might not have been harmless. (See *In re Martin* (1987) 44 Cal.3d 1, 51 [long deliberations may suggest a "very close" case].) We thus conclude the erroneous admission of Jane Doe's hearsay statements was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.